IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TERESA SMITH, | ) | CASE NO. 5:16CV2714 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE PATRICIA A. GAUGHAN |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Teresa Smith ("Smith") seeks judicial review of the final decision of Defendant

Commissioner of Social Security ("Commissioner") denying her application for Disability

Insurance Benefits ("DIB"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

This matter has been referred to the undersigned Magistrate Judge for a Report and

Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth more fully below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

## I. Procedural History

On May 14, 2013, Smith protectively filed an application for DIB, alleging a disability

onset date of May 1, 2013. Tr. 13, 76. She alleged disability based on the following: arthritis in

back and hips, degenerative disc disease, herniated disc, spondylosis, and asthma. Tr. 175.

After denials by the state agency initially (Tr. 85) and on reconsideration (Tr. 97), Smith

requested an administrative hearing. Tr. 112. A hearing was held before Administrative Law

Judge ("ALJ") Paula J. Goodrich on July 16, 2015. Tr. 31-75. In her September 15, 2015,

decision (Tr. 13-25), the ALJ determined that Smith is able to perform her past relevant work,

i.e., she is not disabled.  Tr. 24.  Smith requested review of the ALJ's decision by the Appeals Council (Tr. 7) and, on September 14, 2016, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Smith was born in 1955 and was 57 years old on the date her application was filed.  Tr. 76.  She previously worked preparing food samples in a store, as a prep cook, and doing inventory control and billing for a tool company.  Tr. 37, 45, 46, 74.  She completed twelfth grade.  Tr. 41.

### B.  Relevant Medical Evidence

On October 3, 2011, Smith saw her primary care physician, Douglas Harley, D.O.  Tr. 292.  Her primary complaint was asthma.  Tr. 292.  She also complained of back pain, ankle pain, joint stiffness, and chronic pain.  Tr. 292-293.  She had a history of hyperthyroidism.  Tr. 292.  Upon exam, she had a normal range of motion, flexion and rotation in her neck and spine, she had no tenderness to palpation, a normal posture and gait, and was able to climb onto the exam table normally and change positions normally and smoothly.  Tr. 292.  She had paraspinal muscle tightness.  Tr. 292.  Dr. Harley commented, "C7-T1 tissue texture changes and muscle spasm noted on the right side.  Examination of the lumbar spine revealed spasm and tissue texture changes at the L3-S1 region on her left."  Tr. 297.  Smith reported that she had stopped taking her prescribed medication (meloxicam and cyclobenzaprine) because they were "no help."  Tr. 292.  She was not taking aspirin or NSAIDs.  Tr. 292.  Her pain was improved by pain medication.  Tr. 293.  She exercised 5 or more days per week.  Tr. 294.  Her occupational activities included "Stands on her feet a lot during the day at work, 6 hours per day 4 days a

week" and her work status was "without restrictions." Tr. 293. Dr. Harley assessed her with back pain and muscle spasm, not controlled. Tr. 297. He recommended "continuing ordinary activity within appropriate limits," stretching exercises, and the use of cooling to painful areas. Tr. 298.

On May 22, 2012, Smith returned to Dr. Harley. Tr. 273. Upon exam, she appeared well, had no spine tenderness, had full range of motion in her spine, and full muscle tone in her lower extremities. Tr. 276. Dr. Harley assessed her with hyperthyroidism, asthma, and back pain, controlled. Tr. 276. He recommended that she continue taking her baclofen and diclofenac, continue her ordinary activities, and encouraged weight loss and regular physical activity. Tr. 274, 277.

On January 11, 2013, Smith saw Dr. Harley for aches and pains and possible refills. Tr. 264. She reported back pain radiating to her ankle and foot and numbness in her feet. Tr. 264. She was taking her medications, including tramadol, which, she reported, improved her pain but only for 1 to 1½ hours. Tr. 264. Upon exam, she had neck tenderness and spine tenderness; specifically, she was tender to palpation over her paraspinal muscles in her cervical and mid thoracic region and over her L5-S1 joint space, right greater than left. Tr. 267. She also had decreased lumbar lordosis, decreased muscle weakness (4/5) in her lower right extremity and left foot discomfort upon palpation of her heel. Tr. 267. She had a normal gait, was able to climb onto the exam table and change positions normally and smoothly, had a normal range of motion in her neck and spine, normal rotation and flexion, a good range of motion and muscle strength in her left foot, a normal left ankle, and no muscle weakness in her upper extremities. Tr. 267. Dr. Harley suspected issues with bone spurring in her left foot and ordered imaging of her ankle and spine. Tr. 267-268. He increased her tramadol. Tr. 269.

X-rays of Smith's cervical spine showed mild multilevel spondylosis and no vertebral compression (Tr. 308); x-rays of her thoracic and lumber spine showed multilevel spondylosis (Tr. 310, 314); and x-rays of her left ankle showed a plantar spur, but no misalignment or significant arthropathy (Tr. 312). An MRI of her lumbar spine showed disc bulges at L3-L4, L4-L5, and L5-S1, with a central disc protrusion at L5-S1, resulting in mild spinal canal stenosis and bilateral foraminal encroachment, left greater than right, and abutting the left S1 nerve root but with no nerve root impingement. Tr. 315-316.

At a follow-up visit with Dr. Harley on March 27, 2013, Smith reported having had five visits with physical therapy, her pain had improved "and resolved from her legs," and she was continuing her home exercises and posture correction. Tr. 254. She complained of lower back pain that radiated to her ankle/foot and stiffness. Tr. 254. She again reported standing "a lot" of the day at work, 6 hours per day, 4 days a week, without limitations. Tr. 254. She exercised at least five days a week. Tr. 256. Upon exam, she appeared well and healthy, had a normal gait and range of motion, and no tenderness. Tr. 257. She had paraspinal muscle tightness, muscle weakness in her right lower extremity but no decreased muscle tone, and normal straight leg raise testing. Tr. 257. Dr. Harley diagnosed her with degenerative disc disease at L3-S1 with S1 nerve root compression, multilevel spondylosis, and back pain, not controlled. Tr. 257. He continued her medications and increased her gabapentin. Tr. 257-258. He recommended weight loss, physical activity, and advised her to maintain or resume her normal activity within appropriate limits. Tr. 258.

On April 24, 2013, Smith returned to Dr. Harley for a follow-up visit complaining of back pain and stiffness. Tr. 248. She still stood on her feet "a lot" performing her job, 6 hours a day, 4 days a week, without limitations. Tr. 248. Upon exam, she appeared well, had a normal

gait, was able to climb on the exam table normally and change positions smoothly and normally, had a reduced range of motion in her lumbar spine, neck tenderness, thoracic and lumbar spine tenderness, and muscle weakness in her right lower extremity. Tr. 251. Dr. Harley increased her gabapentin dose, hoping to thereby decrease her tramadol intake. Tr. 252. He discussed with Smith alternative medications such as Cymbalta, but Smith was not interested due to the risk of side effects. Tr. 252. He again recommended weight loss and that she continue her regular activity, and follow up in a month to re-check her chronic pain and for medication adjustment. Tr. 252.

Smith saw Dr. Harley on August 14, 2013, complaining of lower back pain that radiated to her ankle/foot. Tr. 242. She was still standing on her feet "a lot" at work, 6 hours per day, 4 days a week, without limitations. Tr. 242. Upon exam, she had tenderness and decreased range of motion in her lumbar spine, a normal gait, and could climb onto the exam table normally and change positions smoothly and normally. Tr. 245. She had lost 19 pounds. Tr. 242. Dr. Harley assessed her with back pain and disc degeneration with nerve root compression, controlled, and recommended she continue normal ordinary activity with appropriate limits. Tr. 246.

On August 23, 2013, Smith returned to Dr. Harley complaining of moderate pain in her hip and buttocks. Tr. 236-237. Weight-bearing was well tolerated. Tr. 237. She was still standing on her feet "a lot" at work, 6 hours per day, 4 days a week, without limitations. Tr. 236. Upon exam, she appeared well, had a normal gait, was able to climb onto the exam table normally and able to change positions smoothly and normally. Tr. 239. She had no tenderness in her spine, full range of motion in her thoracic and lumbar spine, and paraspinal muscle tightness. Tr. 239. Her hip exam was normal. Tr. 239-240. Dr. Harley assessed her with left

acute moderate hip pain and recommended that she continue ordinary activities and use a heating pad as necessary. Tr. 240.

On November 19, 2013, Smith saw Dr. Harley for a 3-month follow-up appointment for back pain. Tr. 322. She reported continuing severe back pain radiating to her ankle and foot and stated that she had numbness in her feet. Tr. 322. She continued to stand "a lot" during work, 6 hours a day, 4 days a week, without limitations. Tr. 322, 324. She reported increased pain in her neck. Tr. 323. She was taking her gabapentin, tramadol and Vicodin but these did not provide much relief. Tr. 323. Dr. Harley commented that she had been to physical therapy for her lumbar spine but not for her cervical spine and that she had not been referred to an orthopedic spine specialist or to pain management. Tr. 323. Upon exam, she had a normal posture, gait, ability to climb on the exam table and change position. Tr. 325. She had a normal range of motion in her lumbar, thoracic, and cervical spine but paraspinal muscle tenderness in all three areas. Tr. 325. She had no weakness in her upper or lower extremities. Tr. 325. Dr. Harley assessed Smith with chronic pain and muscle spasm, not controlled, and increased her Vicodin and muscle relaxant, referred her to a back specialist, and recommended that she continue normal activities. Tr. 326.

On December 5, 2013, Michael Smith, M.D., drafted a letter to Dr. Harley summarizing his orthopedic consultation with Smith. Tr. 354-355. He wrote that Smith had experienced back pain for 35 years and that it had gotten worse "in the last number of months where she was functioning at a relatively high level and now is a bit more impaired." Tr. 354. She reported failing physical therapy but never trying epidural steroid injections. Tr. 354. Dr. Smith commented that Smith had brought her lumber MRI for him to review, that he had reviewed it, and that it was "a pretty unimpressive MRI." Tr. 354. He observed that there was no

pathological process, she had some mild degenerative changes, some mild stenosis at L4-5, "really no significant stenosis levels above that or below that," and no significant disc herniation or bony osseous abnormality. Tr. 354. Upon exam, Dr. Smith found Smith to be a coordinated adult with stable, symmetric lower and upper extremities with good range of motion, a normal gait, and an ability to get on and off the exam table without difficulty. Tr. 354. She could toe walk, heel walk, and do 10 toe raises bilaterally (showing no gross motor weakness). Tr. 355. Her manual motor testing results were normal, she had a normal range of motion in her hips without significant pain at the extremes, no muscle atrophy, normal pulses, and her back was slightly tender to palpation. Tr. 355. Dr. Smith assessed her with "very early spinal stenosis" and recommended epidural injections. Tr. 355.

On February 10, 2014, Smith had a follow-up visit with Dr. Harley. Tr. 389. She complained of back pain radiating to her ankle/foot, back stiffness and reduced range of motion. Tr. 389. She reported that, due to increased back discomfort, she had reduced her work to part time, now standing "a lot" during the day at work, 6 hours a day, for 10 days a month, without limitations. Tr. 389. She continued to exercise at least five days a week. Tr. 391. She had received one injection from Dr. Smith and the plan was for three injections. Tr. 390. She had been noticing increased bilateral hip and neck pain. Tr. 390. Upon exam, she had a normal gait, posture, range of motion in her spine, muscle strength, and ability to change positions. Tr. 392-393. She had paraspinal muscle tenderness. Tr. 393. Dr. Harley refilled her medications and recommended continuing ordinary activity and using a heating pad. Tr. 393.

On May 12, 2014, Smith returned to Dr. Harley for a follow up visit. Tr. 382. She had an upcoming steroid injection with Dr. Smith. Tr. 382. She was still working her reduced schedule and exercised at least five days a week. Tr. 382, 385. She reported taking about 6

tramadol pills per day but occasionally needing more. Tr. 383. It had been awhile since she last needed the Vicodin—she only took it when she experienced severe pain. Tr. 383. Upon exam, she had a normal gait, posture, range of motion, ability change position, and muscle strength, but she had tenderness in her lumbar spine and paraspinal muscle spasm in the L4, L5, and S1 region of her back. Tr. 386. Dr. Harley recommended Smith have her epidural injection with Dr. Smith and continue ordinary activity. Tr. 386. He also recommended a referral to pain management. Tr. 387. A urinalysis test was negative for Vicodin but positive for cocaine metabolites. Tr. 399-400.

On July 21, 2014, Smith saw Bina Mehta, M.D., at The Spine + Pain Institute for back pain along her entire spine and radiating into her left buttock. Tr. 370. Smith reported that her pain was moderate, the problem was fluctuating and it occurred persistently. Tr. 370. Her symptoms were aggravated by standing, sitting, walking, pulling, climbing, riding and driving and were relieved by lying down and sitting. Tr. 370. She also experienced spasms. Tr. 370. She denied joint pain, limping, numbness and weakness. Tr. 370. She reported worsening pain, that her gabapentin helped very little, and that epidural injections she had had in 2013 did not help and one she had a few months prior increased her pain. Tr. 370. She reported visiting a chiropractor in the 1980's that made her pain tolerable and doing physical therapy years before. Tr. 370. Currently, her whole body ached and she was very sore. Tr. 370. Her neck, hips and thoracolumbar area were very tight and painful. Tr. 370. Her feet would go numb with prolonged sitting and she recently began to notice that, when she rests her arm on something, her hand would go numb. Tr. 370. She had had some episodes of sciatic pain that seemed to improve with physical therapy. Tr. 370. Upon exam, she had normal wrists and shoulders, normal gait, forward head posture, normal upper extremity strength and muscle tone, and normal

muscle tone in her paraspinal muscles. Tr. 373-374. In her cervical spine area she had tenderness to palpation in her trapezius muscles, normal sensory testing, and a decreased range of motion. Tr. 374. In her lumbar spine area her posture was normal, her lower extremity and paraspinal muscle tone was normal, and she had no muscle spasm. Tr. 374. She had a decreased range of motion and it was painful. Tr. 375. She had tenderness in her lumbar and thoracic spine and her gluteal muscles. Tr. 374. Her hips, knees, ankles and feet range of motion were normal and pain free and she had full strength. Tr. 375. Dr. Mehta assessed Smith with degenerative lumbosacral disc disease, myalgia and myositis NOS, cervical spondylosis, and lumbar disc displacement and provided three trigger point injections in her trapezius muscles and her right gluteal muscle. Tr. 376. Dr. Mehta opined that Smith had very diffuse soft tissue pain that would likely benefit from Cymbalta, but Smith was not interested in trying it because she did not think it had been on the market long enough. Tr. 376. Dr. Mehta informed her that she could not prescribe opioids "due to her cocaine use" and referred her for chiropractic treatment. Tr. 376.

On August 25, 2014, Smith saw Dr. Mehta for a second trigger point injection. Tr. 366. She reported that the first injections were helpful. Tr. 366. She reported a lot of tightness in her left scapula area and she had not been to the chiropractor because of her work schedule. Tr. 366. Her knees were achy and kept her awake at night. Tr. 366. Upon exam, she had a decreased range of motion in her lumbar spine, normal range of motion in her hips, tenderness to palpation in her knees and a decreased range of motion, normal feet and ankles, and full strength. Tr. 367-368. Dr. Mehta ordered x-rays for Smith's knees and provided trigger point injections to her trapezius muscles, left scapular, and right paraspinal muscles of her lumbar spine. Tr. 368.

On September 3, 2014, Smith saw chiropractor David Leone, D.C., at The Spine + Pain Institute, complaining of worsening lower back and neck pain, currently moderate to severe. Tr. 362. Her pain was aggravated by going up and down stairs, bending, sitting, standing, twisting, walking, lifting, pushing, pulling, flexion and extension. Tr. 362. There were no relieving factors. Tr. 362. Upon exam, Smith had normal posture, muscle tone and strength, no muscle spasms, and decreased range of motion in her lumbar spine and knees. Tr. 364. She had tenderness to palpation in her thoracic, lumbar, and gluteal muscles. Tr. 364. Dr. Leone provided manipulation and neuromuscular reeducation. Tr. 365.

Smith returned to Dr. Leone on September 10 for manipulation, decompression and neuromuscular treatment. Tr. 403. She reported that she was very sore after her last treatment the prior week. Tr. 403. Upon exam, she had a normal gait, posture, and muscle tone, with no spasm. Tr. 406. She had decreased range of motion in her knees and lumbar spine but normal strength in her lower extremities. Tr. 406. Dr. Leone provided electrical stimulation therapy and neuromuscular reeducation. Tr. 407. Smith saw Dr. Leone on October 1, complaining of increasingly severe back pain that radiated to her neck and knees. Tr. 408. Upon exam, her gait, posture, and muscle tone were normal and she had no spasms. Tr. 411. She had a decreased range of motion in her lumbar spine and knees. Tr. 411. She received electrical stimulation, decompression treatment and neuromuscular reeducation. Tr. 412.

On April 22, 2015, Smith returned to Dr. Harley to follow up for her asthma and hypothyroidism. Tr. 414. She reported that she had stopped taking most of her medications seven months earlier, when her son passed away, because she "just has not felt like taking anything." Tr. 414. She had not filled her Tramadol prescription since the prior May, almost a year earlier. Tr. 414. She was depressed and had stopped working due to "everything that was

going on." Tr. 414.  Upon exam, she had a normal gait, normal muscle tone and strength, and a normal range of motion in her lumbar spine.  Tr. 417.  She had lumbar spine tenderness and chronic tissue texture changes and paraspinal muscle spasm in her L4, L5, S1.  Tr. 417.  Dr. Harley prescribed gabapentin, baclofen and diclofenac and recommended treatment for depression.  Tr. 418.

On June 24, 2015, Smith saw Dr. Harley complaining of back, neck, and right knee pain and problems sleeping.  Tr. 430.  She reported avoiding daily activities because of pain and treating her pain by changing positions, including lying down.  Tr. 431.  She was depressed and had gained weight.  Tr. 431.  Upon exam, she had tenderness in her right knee but a normal range of motion and full strength.  Tr. 433-434.  Her gait was normal and she had a normal ability to climb onto the exam table.  Tr. 433.  Dr. Harley ordered an x-ray of Smith's right knee, suspecting a popliteal cyst, and increased her Zoloft dosage for her insomnia.  Tr. 434.  The x-rays of Smith's right knee showed suggestion of a small joint effusion but were otherwise unremarkable.  Tr. 426.  An x-ray of her right hip showed degenerative changes and a subchondral cyst formation off the femoral head.  Tr. 425.

### C.  Medical Opinion Evidence

#### 1. Treating source

O November 19, 2013, Dr. Harley completed a residual functional capacity questionnaire on behalf of Smith.  Tr. 352.  Dr. Harley opined that, in an 8-hour workday, Smith could sit for one hour total, fifteen minutes at a time; stand for one hour total, twenty or thirty minutes at a time; and walk for one hour.[1]  Tr. 352.  She would require a sit/stand option at will.  Tr. 352.  She would not be capable of lifting more than ten pounds occasionally and she could never or rarely lift 11-20 pounds.  Tr. 352.  She could occasionally climb, reach and bend but could never

---

[1]  It is not clear whether Dr. Harley's handwriting on the form reads "20" or "30" minutes for the ability to stand.

squat or crawl.  Tr. 352.  She could not perform simple grasping, pushing or pulling, but she could perform fine manipulation and use foot controls.  Tr. 352.  She had a mild limitation for driving.  Tr. 352.  She would be absent from work two days per month and was unable to return to full-time employment.  Tr. 352.

### 2. State Agency Reviewing Physicians

On October 11, 2013, state agency reviewing physician Leanne Bertani, M.D., reviewed Smith's record.  Tr. 79.  Regarding Smith's residual functional capacity ("RFC"), Dr. Bertani opined that Smith could perform light work with additional postural and environmental limitations. Tr. 80-82.

On January 5, 2014, state agency reviewing physician Linda Hall, M.D., reviewed Smith's records and opined that she could perform light work with additional postural and environmental limitations.  Tr. 91-93.

### D.  Testimonial Evidence

### 1.  Smith's Testimony

Smith was represented by counsel and testified at the administrative hearing.  Tr. 36-65, 69.  She testified that she lives in a house with her husband.  Tr. 40.  She drove herself to the hearing.  Tr. 41.  She does not have a handicap placard.  Tr. 41.

Smith previously worked part time as a food demonstrator making samples at Walmart. Tr. 37, 38.  She continued working that job for a year after her alleged onset date; she stopped working due to emotional problems when her son passed away.  Tr. 36-39, 64.  Her employer would only give her three days off to grieve and she needed more time.  Tr. 64.  The heaviest she lifted at her food demonstrator job was about ten pounds.  Tr. 42.  It was a six-hour shift with a half-hour lunch break and two ten-minute breaks.  Tr. 43.  She stood the entire time she did that

job; as time went on, her feet would go numb and her back would hurt "really bad." Tr. 43. She would work anywhere from one to four days a week and averaged two days a week. Tr. 43. Farther back in her work history she performed inventory control for a tool company for 13 years. Tr. 46. She would key data into the computer, print it, and bill it after it shipped. Tr. 46. She did a lot of reports regarding inventory coming and going; somebody else would count the tools and she would enter the information into the computer. Tr. 46. Most of the time she performed the job seated, although she would sometimes go out and re-count inventory. Tr. 47.

When asked what prevented her from working, Smith stated that she can't stand or sit for very long. Tr. 49. She has to be "up and down." Tr. 49. Mostly she lies down. Tr. 49. She has issues with her neck; some days her head feels so heavy that she doesn't think her neck can support it. Tr. 49. She has arthritis everywhere. Tr. 49. She has a bad hip, which makes it hard to walk. Tr. 49. If she stands too long her feet go numb. Tr. 49. She has a herniated disc and "something on top of my back too." Tr. 50. Dr. Smith, who is a surgeon, told her that she will need surgery in ten years. Tr. 51. She was also told by another provider that she had a dislocated bone in her neck and that provider asked if she had ever been in a car accident. Tr. 52. She has had "a lot of those trigger point shots" in her neck, physical therapy, massage therapy with a chiropractor, and acupuncture. Tr. 51, 52. She takes pills that make her "real spacey." Tr. 50. She has had back issues for about 20 years. Tr. 50.

When asked whether she could perform her prior job at the tool company, Smith answered that she could not; she can't sit for that long due to pain in her back, hip and knee. Tr. 53, 60. She will require surgery on her knee for the popliteal cyst, "and then I don't know what's wrong here with the front of my knee .... I think he said I had arthritis, but something's seriously wrong because it wakes me up at night it hurts so bad." Tr. 53. When asked whether she had

any medication for pain, Smith answered that she did not. Tr. 53. She had been on tramadol but that became a narcotic and "I don't like narcotics, so I don't do those." Tr. 53. She also doesn't like any new drug. Tr. 53. She "mostly take[s] aspirin" and anti-inflammatories. Tr. 53. No provider has ever talked about seeing a rheumatologist for her arthritis because no one ever told her she had rheumatoid arthritis, "it's just arthritis." Tr. 53-54. Currently, her hand is so bad it takes "like six hours in the morning before [her hand] actually works." Tr. 54.

On a typical day, Smith wakes up, gets her coffee, and then sits down and tries to get her body to start working because everything cracks and hurts and aches. Tr. 54. She lies down "quite a bit" or "most of the day," every day, because she can't do a whole lot. Tr. 54, 59. She lies down on the couch or sometimes in bed to take the pressure off her hip and back. Tr. 59, 61. She normally does her dishes in the morning. Tr. 54. If there are a lot of dishes she has to do it in two loads because if she stands at the sink and washes dishes "it feels like my muscle is pulling away from my backbone." Tr. 54. It is "red hot up my spine." Tr. 54. The same thing happens when she sweeps with a broom. Tr. 54. She can't run the sweeper. Tr. 54. Her husband carries the laundry downstairs, where she will then put it in the washer and switch loads. Tr. 54. She lives in a two-story house and "barely make[s] it up the steps, so I'm pretty sure I'm going to have to move to a ranch." Tr. 54. She goes to the grocery store and she has to bag her groceries in small bags and then make several trips "to get those done." Tr. 55. Then, she cooks dinner. Tr. 55. She used to love to walk but she can't do that now. Tr. 55. She last time she was able to go for a long walk was a couple of years ago. Tr. 55. She recently walked two blocks up to the park with her grandchildren "but that about killed me." Tr. 55. The heaviest she can lift is probably 15 pounds for "seconds" but could not hold it for any period of time. Tr. 55.

When asked if anyone ever told her why her feet go numb if she stands too long, Smith stated, "well, I had those nerves hung up in my back" and pain that went behind her leg. Tr. 55. Also, her fingers go numb in the wintertime. Tr. 55. She has to move her hand to try to get the blood back. Tr. 56.

Smith went through her medication list: she takes Neurontin three times a day, "I'm assuming it's some kind of anti-inflammatory." Tr. 56. She has been on it for about two to three years. Tr. 57. She takes baclofen at night, which she guesses is also an anti-inflammatory. Tr. 57. She takes sleep medication and an antidepressant. Tr. 57. She also takes diclofenac, an anti-inflammatory. Tr. 58. When asked if the medication she is on other than Neurontin also causes side effects, Smith replied that she started all her medications "at the same time pretty much" but she knows that it's the Neurontin that makes her "kind of crazy." Tr. 58. Her medications were prescribed by Dr. Harley, her primary care physician, whom she has seen for the last five or six years. Tr. 58. Aside from her medications, she uses ice packs, a heating pad, and takes hot showers. Tr. 59. She stated that she was never told by a provider that she would need surgery, aside from her knee, because the problem is arthritis. Tr. 60.

Smith testified that she had a gap in treatment for about eight months after her son passed away. Tr. 61. Her attorney asked her, "I take it you didn't even care, did you?" and Smith agreed. Tr. 61. Smith returned to Dr. Harley a few months ago because she "couldn't move." Tr. 61. She had also stopped taking her medications during her gap in treatment and started taking them again recently. Tr. 61. The ALJ asked her whether she felt better when she was taking her medications before her gap in treatment than she did since restarting them. Tr. 62. Smith answered that she did not feel better before her gap in treatment. Tr. 62. The ALJ asked her if her medications helped her and Smith stated, "They help a lot." Tr. 62. She explained

that, when she was off medication for eight months, she could hardly move and she couldn't do anything.  Tr. 62.  She couldn't do dishes, she couldn't carry anything; she just laid on the couch and cried.  Tr. 62.  The ALJ asked Smith whether, had she not suffered that tragedy, she would still be working today.  Tr. 64.  Smith did not think so; she is in a downhill spiral and has continually gotten worse: her back, neck, knee, shoulder, feet, and hand.  Tr. 64.  She also explained that, technically, she was not permitted to take a lunch break or other breaks at work but "a lot" of times she would take breaks, go in her car, put the seat back and lie flat.  Tr. 65.

### 2.  Vocational Expert's Testimony

Vocational Expert Mary Beth Kopar ("VE") testified at the hearing.  Tr. 65-74.  The ALJ discussed with the VE Smith's past work.  Tr. 66-67.  The ALJ asked the VE to determine whether a hypothetical individual of Smith's age, education and work experience could perform the work she performed in the past if that person had the following characteristics: can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently, can stand and/or walk with normal breaks for about 6 hours in an 8-hour workday, can sit for about 6 hours in an 8-hour workday, can occasionally perform all postural activities except that the individual could never climb ladders, ropes or scaffolds, and must avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation and pulmonary irritants.  Tr. 67-68.  The VE answered that such an individual could perform Smith's past work as a billing clerk.  Tr. 69.  The ALJ asked if the VE's answer would change if the exertional level were reduced to sedentary work, i.e., lifting 10 pounds occasionally, standing or walking for 2 hours in an 8-hour workday, and sitting for 6 hours in an 8-hour workday.  Tr. 69.  The VE responded that such an individual could still perform the job of billing clerk.  Tr. 69.

Next, the ALJ asked the VE if the hypothetical individual could perform past work or any other work if she were limited to a total of less than 8 hours of sitting, standing and walking in an 8-hour workday, regardless of how the time is allocated for each, and the VE stated that such an individual could perform no work. Tr. 70. The ALJ asked how many days of work a month an individual could miss and the VE stated that both unskilled work and semi-skilled work, including Smith's past work, would permit absences no more than two days a month. Tr. 70.

Smith's attorney asked the VE how she arrived at her designation of Smith's past work as "billing clerk" when Smith described it as inventory control and stated that she would have to get up once in a while to do things. Tr. 71. The VE answered that she arrived at billing clerk for this job designation based on Smith's description of gathering records and orders, compiling data, entering it into the computer, and typing the invoices and reports. Tr. 71. The VE acknowledged that Smith testified that she would have to get up every once in a while, i.e., sitting up to 6 hours and standing and walking up to two, and that the VE took this into account. Tr. 71. Smith's attorney asked if the hypothetical individual described by the ALJ could perform any jobs if she were limited to occasionally lifting up to 10 pounds and rarely lifting between 11-20 pounds. Tr. 71. The VE explained that the DOT does not use the designation "rarely"—it's either occasionally, frequently, continuously, or never—but that occasionally lifting 10 pounds is classified as sedentary work. Tr. 71.

Smith's attorney asked if the VE's answers to the hypotheticals would be affected by the addition of a sit/stand option and the VE responded that her answers would change and that there would be no jobs at the sedentary level. Tr. 71. The VE explained that, with a sit/stand option, it cannot be determined how much time the person would be sitting or standing throughout the day; it could be standing for as little as an hour or as much as 8 hours and it could change from day to

day.  Tr. 72.  When asked if the billing clerk position she identified could be performed with a hypothetical that included a sit/stand option, the VE replied that she would have no way of knowing how much time the individual would need to sit or stand and that the job billing clerk is classified as sedentary work.  Tr. 72.  If the sit/stand option meant that the individual could not sit for up to six hours, the VE agreed that the job of billing clerk would be eliminated.  Tr. 72.  The VE also agreed that if any of the hypothetical individuals described would be off task for more than 15% of the time there would be no jobs that they could perform.  Tr. 72.

Smith's attorney asked if an individual could perform any sedentary work if she were limited to occasional fingering, handling and grasping with her hands due to arthritis.  Tr. 72-73.  The VE responded that the only job she knew of that fits within that description would be a surveillance systems monitor.  Tr. 73.  Smith's attorney asked if that job would be eliminated with a sit/stand option and the VE stated that that job could be performed sitting or standing.  Tr. 73-74.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In her September 15, 2015, decision, the ALJ made the following findings:

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2018. Tr. 15.

2. The claimant has not engaged in substantial gainful activity since May 1, 2013, the alleged onset date. Tr. 15.

3. The claimant has the following severe impairments: multi-level spondylosis of the cervical, thoracic, and lumbar spine, degenerative disc disease of the lumbar spine with disc protrusion and lumbar radiculopathy, degenerative joint disease of the right hip, obesity, asthma, suspected popliteal cyst and small joint effusion of the right knee, calcaneal spur of the left ankle, myalgia and myositis-not otherwise specified. Tr. 15.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 17.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant may occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant must avoid concentrated exposure to fumes, odors, dust, gases and poor ventilation. Tr. 18.

6. The claimant is capable of performing past relevant work as a billing clerk/inventory control, having a sedentary exertional level designation and a specific vocational preparation factor of four, and food demonstrator, having a light exertional level designation and a specific vocational preparation factor of three. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. Tr. 24.

7. The claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2013, through the date of this decision. Tr. 25.

### V. Parties' Arguments

Smith objects to the ALJ's decision on one ground: the ALJ failed to give appropriate weight to the opinion of her treating physician, Dr. Harley. Doc. 12, pp. 8-13. In response, the Commissioner submits that the ALJ properly weighed Dr. Harley's opinion and that her decision is supported by substantial evidence. Doc. 14, pp. 11-24.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Id*. In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See id*.; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

Dr. Harley opined that Smith could sit, stand and walk for one hour each, required a sit/stand option, could occasionally lift no more than 10 pounds, could not grasp, push or pull, and would miss 2 days a month. Tr. 23, 352. The ALJ considered Dr. Harley's opinion and gave it "little" weight. Tr. 23-24. She observed that Dr. Harley was Smith's primary care physician and had seen and treated Smith over a lengthy period of time. Tr. 23-24. She commented that, throughout that time, Dr. Harley repeatedly stated that Smith should maintain her ordinary activities, which included working without restriction and "standing on her feet for six hours per shift." Tr. 23. The ALJ found that there was a severe conflict between what Dr. Harley knew Smith did and encouraged her to continue to do (i.e., stand on her feet most of a six hour workday), with what he reported that Smith was capable of doing in his questionnaire (e.g., stand for no more than one hour). Tr. 24.

Smith argues that the ALJ did not give "good reasons" for the weight she assigned to Dr. Harley's opinion in violation of the treating physician rule, and that the ALJ should have given Dr. Harley's opinion "great weight." Doc. 12, pp. 8-13, Doc. 15.[3] She believes that the first four factors in 20 C.F.R. § 404.1527(c)(2) weigh in her favor and that the ALJ did not sufficiently articulate the fifth and final factor. But the ALJ is not required to provide a factor-by-factor analysis when considering a treating source opinion. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. App'x 802, 804 (6th Cir. March 16, 2011) ("Although the regulations instruct an ALJ to consider these factors [in 20 C.F.R. § 404.1527], they expressly require only that the ALJ's decision include 'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion'—not an exhaustive factor-by-factor analysis."). Although Smith believes that the factors weigh in her favor, she does not describe an error by the ALJ and, instead, simply

---

[3] Smith does not argue that Dr. Harley's opinion is entitled to "controlling weight" or that the ALJ erred in not assigning controlling weight to Dr. Harley's opinion. Accordingly, review is limited to considering whether the ALJ failed to provide "good reasons" for giving Dr. Harley's opinion "little weight."

disagrees with the ALJ's conclusion. Smith's disagreement is not grounds for reversing the ALJ's decision. *See Garner*, 745 F.2d at 387.

Here, the ALJ acknowledged that "Dr. Harley, D.O.," was Smith's longtime, primary care physician and was "reporting within the bounds of his professional certifications." Tr. 23. The ALJ found, however, that Dr. Harley's opinion was not supported by the record, including his own treatment notes. Tr. 24. Smith contends that the ALJ erred because she offered "no meaningful articulation of how the objective medical evidence does not preclude [her] from all work." Doc. 12, p. 11. She asserts that it is "impossible" for the Court to identify the ALJ's finding, "let alone whether or not [her] finding is supported by substantial evidence." Id. The undersigned disagrees. With respect to Smith's back pain, the ALJ detailed the objective evidence in the record, including her diagnoses of degenerative disc disease in her lumbar spine and spondylosis of her cervical, thoracic and lumbar spines. Tr. 19. The ALJ observed that x-rays showed the spondylosis in her cervical spine was mild and her thoracic spine showed diffuse endplate osteophytes. Tr. 19. She remarked that imaging studies of Smith's lumbar spine showed multi-level degenerative disc disease, most pronounced from the L4 level through S1, with mild canal stenosis at L5/S1 but with no nerve root impingement at any level, a result that an orthopedic consultant assessed as "pretty unimpressive." Tr. 19. The ALJ commented that physical exams consistently, albeit not universally, showed minimal or normal findings, including a normal gait, the ability to get on and off the exam table smoothly, normal range of motion, with paraspinal tightness but no spasming, no tenderness, negative straight leg raises, negative Patrick's and Faber's tests, and normal strength. Tr. 19. The ALJ noted that Smith had also had exam visits showing tenderness, reduced lumbar range of motion, and spasming, but

that on those visits she also exhibited a normal gait, normal strength, and negative straight leg raises.  Tr. 19.

The ALJ explained that Smith had followed a medication regime with good effect, that her medication modality ceased when a drug screen showed cocaine metabolites, and that Smith thereafter continued to use prescribed medications with inconsistently reported side effects.  Tr. 20.  The ALJ stated that, although Smith attended pain management for about three months, this treatment concluded almost a year prior to the ALJ's decision and the course of treatment was too brief for any conclusions to be drawn.  Tr. 20. The ALJ remarked that Smith ceased all treatment for six months.  Tr. 22.  The ALJ commented that Smith had reported the following daily activities at one point or another in the record: caring for self, light household chores, spending time with grandchildren, driving a car, shopping in stores, exercising five days a week, working part-time, and managing an email account.  Tr. 23.  She had made inconsistent statements that rendered her allegations of the severity of her symptoms not entirely credible, such as stating during the hearing that she took all her medications as prescribed despite medication non-compliance in the record, and stating that she suffered no side effects but elsewhere reported that her medication made her "spacey."  Tr. 23.  The ALJ gave "considerable" weight to the state agency reviewing physicians, whose opinions she found to be supported by liberal citations to the record and who, she remarked, were well versed in the agency's analytical framework.  Tr. 23.  As for Smith's other impairments, the ALJ discussed the mostly normal imaging results of her right hip (mild degenerative changes), her right knee (small effusion but otherwise unremarkable), and bone spur in her left foot (calcaneal spur but no other abnormalities).  Tr. 20, 21, 22.  The ALJ cited treatment notes showing that, despite the above findings, Smith had a normal gait, strength and range of motion.  Id.  In other words, contrary to

Smith's assertion, the ALJ provided a meaningful articulation of why the objective evidence did not show that Smith was precluded from all types of work.

Smith argues that, despite the ALJ's comment that Smith's lumbar MRI showed no nerve root impingement at any level, Smith's MRI "indicates nerve root compression at L5-S1." Doc. 12, p. 11 (citing Tr. 315-316). A review of Smith's MRI results supports the ALJ's statement: the MRI results showed no nerve root impingement at any level and did not show "nerve root compression at L5-S1" or anywhere else. See Tr. 315-316. Next, Smith contends that the ALJ failed to consider Dr. Harley's "numerous notes regarding [Smith's] moderate to severe back/neck pain, stiffness and weakness that resulted in a limited range of motion with her back/neck or legs on examination." Doc. 12, p. 11 (citing 13 pages of treatment notes). The fact that the ALJ did not cite every treatment note from visits with Dr. Harley does not mean that the ALJ did not consider these treatment notes; nor is an ALJ required to cite every piece of evidence in the record. *See Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) (ALJs are not "required to discuss each piece of data in [their] opinion, so long as they consider the evidence as a whole and reach a reasoned conclusion."); *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 511, 508 (6th Cir. 2006). Moreover, the treatment records Smith cites fall short of supporting her contention that Dr. Harley found Smith to have a limited range of motion in her back and legs. See Tr. 257 (normal range of motion in all areas of spine and legs), 251 (abnormal range of motion in lumbar spine, normal in all other areas of spine and legs), 325 (normal range of motion in all areas of spine and legs), 385-386 (normal range of motion in all areas of spine and legs), 393 (normal range of motion in all areas of spine and

legs).[4]  Furthermore, the ALJ acknowledged that Smith had shown an abnormal range of motion in her lumbar spine and that she generally complained of neck and back pain.  Tr. 19.

Smith's additional challenges to the ALJ's treatment of Dr. Harley's opinion are equally unavailing.  She asserts that the ALJ performed an "incorrect reading of the record" when the ALJ "assumed" that, when Dr. Harley wrote that Smith should maintain her ordinary activities, he meant standing on her feet six hours a day per work shift.  Doc. 12, p. 12.  The undersigned disagrees.  Smith repeatedly told Dr. Harley that, for years, she had been standing on her feet "a lot" of her six hour shift, four days per week, without limitations.  Thus, such activity would be considered Smith's "ordinary activity" and the ALJ did not misread the record.  Smith states, "Dr. Harley actually advised [Smith] to maintain normal activities within appropriate limits" and suggests that performing her 6-hour work shifts were not within appropriate limits.  Doc. 12, p. 12, Doc. 15, p. 2.  But Dr. Harley never said that Smith's normal and longstanding work activity was inappropriate.  It is Smith who speculates, post hoc, what Dr. Harley's remarks in treatment notes could be interpreted to have meant.  But a plain reading of the treatment notes does not support Smith's view.  The fact that Dr. Harley wrote notes that are not favorable to Smith's argument does not mean that the ALJ misread Dr. Harley's notes.

Finally, Smith takes issue with the ALJ's statement that Smith stood on her feet for six hours per work shift.  Doc. 12, p. 12.  She submits that what Dr. Harley's records actually show is that she reported standing on her feet "a lot" during her 6-hour work shift, i.e., less than six hours.  Id.  First, the difference between standing on her feet "a lot" during a six-hour shift as a food demonstrator in a store and standing on her feet for an entire six-hour work shift is not great, especially when Dr. Harley opined that Smith could only stand for one hour total, 20 or 30

---

[4]  The other treatment notes that Smith cites (Tr. 254, 248, 242, 236, 322, 382, 389) do not show objective examination findings but show what Smith reported, i.e., subjective complaints.

minutes at a time, and would need a sit/stand option.  Moreover, the ALJ asked Smith at the hearing, "Were you standing the entire time you did that job [as a food demonstrator]?" and Smith answered, "Yes, and my feet would go numb."  Tr. 43.  The ALJ did not misread the record; Smith's arguments fail.

### VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: September 12, 2017

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).